[Cite as *Cook v. Kudlacz*, 2012-Ohio-2999.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT


| | | |
|---|---|---|
| MARY ANN COOK, et al., | ) | CASE NO. 11 MA 34 |
| | ) | |
| PLAINTIFFS-APPELLANTS, | ) | |
| | ) | |
| VS. | ) | O P I N I O N |
| | ) | |
| SISTER JANE MARIE KUDLACZ, et al., | ) | |
| | ) | |
| DEFENDANTS-APPELLEES. | ) | |


CHARACTER OF PROCEEDINGS:          Civil Appeal from Common Pleas Court,
                                                            Case No. 09CV3795.


JUDGMENT:                                        Affirmed.


<u>JUDGES</u>:
Hon. Joseph J. Vukovich
Hon. Cheryl L. Waite
Hon. Mary DeGenaro


Dated: June 28, 2012

[Cite as *Cook v. Kudlacz*, 2012-Ohio-2999.]

APPEARANCES:

For Plaintiffs-Appellants:                    Attorney Douglas DiPalma
                                              Attorney Megan Miller
                                              1300 East Ninth Street, 20th Floor
                                              Cleveland, Ohio  44114

                                              Attorney Daniel Funk
                                              Attorney Donald Wiley
                                              400 South Main Street
                                              North Canton, Ohio  44720


For Defendants-Appellees:                     Attorney Mary Beth Houser
                                              Attorney Robert Fulton
                                              73 North Broad Street
                                              Canfield, Ohio  44406


                                              Attorney Jennifer Beck
                                              3685 Stutz Drive, #100
                                              Canfield, Ohio  44406

[Cite as *Cook v. Kudlacz*, 2012-Ohio-2999.]
VUKOVICH, J.

{¶1} Plaintiffs-appellants Mary Ann and Rachel Cook (the Cooks) appeal the decision of the Mahoning County Common Pleas Court granting summary judgment in favor of defendants-appellees Sister Jane Marie Kudlacz, Sandra Ketchum (coach Ketchem), The Roman Catholic Diocese of Youngstown Foundation, and Cardinal Mooney High School (collectively referred to as Cardinal Mooney). The Cooks argue that the record presents a genuine issue of material fact as to whether the conduct complained of resulted in a breach of contract, breach of fiduciary duty, negligence, negligent supervision, intentional infliction of emotional distress, and civil conspiracy. For the reasons expressed below, the trial court's grant of summary judgment is hereby affirmed.

STATEMENT OF THE CASE

{¶2} During the 2008-2009 and 2009-2010 school year, Rachel Cook attended Cardinal Mooney High School and was a member of their girls' varsity tennis team. Coach Ketchem was the coach of her tennis team and Sister Jane Marie Kudlacz was the principle of Cardinal Mooney High School. Events that occurred during the tennis season of both school years caused Rachel Cook and her parents to believe that she was being harassed, bullied, and isolated by her fellow teammates. Their allegations concern Rachel's involvement in the extracurricular activity of participating on the tennis team. They do not encompass any alleged harassment or bullying in the educational setting. As a result of the alleged harassment by her teammates and coach and the administration's handling of the situation, Rachel Cook withdrew from Cardinal Mooney High School sometime towards the end of the 2009-2010 school year and began home schooling.

{¶3} Also as a result of the perceived harassment, bullying and isolation, the Cooks filed suit against the appellees seeking injunctive relief and damages. In the complaint the Cooks asserted causes of action in breach of contract, implied duty of good faith and fair dealings, breach of fiduciary duty, negligence, intentional infliction of emotional distress and civil conspiracy. The complaint was later amended to include a claim of negligent supervision. In support of their complaint, the Cooks

claimed that Rachel was intimidated, harassed, isolated, treated unfairly and bullied by the Girls Tennis Team, Coach Ketchem and the administration of Cardinal Mooney. They contended that the Cardinal Mooney handbook and policies, which allegedly set forth a no harassment/bullying policy, created a contract between Cardinal Mooney and Rachel Cook. The Cooks asserted that Cardinal Mooney breached that contract by allowing Rachel Cook to be harassed and bullied. Collectively Cardinal Mooney filed a joint answer to the amended complaint denying the creation of a contract and denying that the treatment of Rachel Cook was harassment and bullying.

**{¶4}** Following discovery, Cardinal Mooney moved for summary judgment. The Cooks filed a motion in opposition to the motion for summary judgment alleging that there are disputes of material fact as to whether Rachel's treatment rose to the level of intimidation and bullying.

**{¶5}** After considering all of the summary judgment arguments, the magistrate granted summary judgment for appellees on the Cooks claim. 12/6/10 Decision. The magistrate found that appellees did not engage in any type of conduct that could be considered a breach of contract. Specifically, that the conduct complained of did not support the claims of harassment and/or intimidation as alleged by the Cooks. Likewise, it also found that the Cooks failed to demonstrate the existence of a fiduciary relationship. As to the negligence, negligent supervision, emotional distress and civil conspiracy claims, the magistrate held that even when construing the evidence most strongly in favor of the Cooks, the record is devoid of evidence which could cause a reasonable person to believe appellees were negligent in their conduct concerning Rachel Cook or Mary Ann Cook. In conclusion it stated:

**{¶6}** "While this Court is mindful of the potential sensitivities of an adolescent, this Court is also aware that the applicable law of this case does not contemplate a remedy for hurt feelings, whether incurred by an adolescent or by an adolescent's parent(s)." 01/25/11 J.E.

**{¶7}** The Cooks filed objections to the magistrate's decision and appellees filed responses to those objections. After taking the matter under advisement, the trial court adopted the magistrate's decision. The Cooks filed a timely appeal from that decision.

## STANDARD OF REVIEW

**{¶8}** The sole assignment of error addresses the propriety of the trial court's grant of summary judgment for Cardinal Mooney. In reviewing a summary judgment award we apply a de novo standard of review. *Cole v. Am. Industries & Resources Corp.*, 128 Ohio App.3d 546, 552, 715 N.E.2d 1179 (7th Dist.1998). Thus, we use the same test as the trial court did, Civ.R. 56(C). That rule provides that the trial court shall render summary judgment if no genuine issue of material fact exists and when construing the evidence most strongly in favor of the nonmoving party, reasonable minds can only conclude that the moving party is entitled to judgment as a matter of law. *State ex rel. Parsons v. Flemming*, 68 Ohio St.3d 509, 511, 628 N.E.2d 1377 (1994).

**{¶9}** With that standard in mind, we now turn to the assignment of error and the arguments made therein.

## ASSIGNMENT OF ERROR

**{¶10}** THE TRIAL COURT ERRED IN GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT.

**{¶11}** There are six causes of action asserted against Cardinal Mooney. Each will be addressed in turn.

### Contract Claims

**{¶12}** The first cause of action asserted against Cardinal Mooney is for breach of a contract.

**{¶13}** "The essential elements of a cause of action for breach of contract are the existence of a contract, performance by the plaintiff, breach by the defendant and resulting damage to the plaintiff." *Flaim v. Med. College of Ohio,* 10th Dist. No. 04AP–1131, 2005–Ohio–1515, ¶ 12. "There is no separate tort cause of action for breach of good faith that is separate from a breach of contract claim. Rather, 'good faith is part of a contract claim and does not stand alone.'" Internal citations omitted. *Northeast Ohio College of Massotherapy v. Bureck*, 144 Ohio App.3d 196, 204, 759 N.E.2d 869 (7th Dist.2001).

**{¶14}** The Cooks claim that the Cardinal Mooney Handbook created a contract and that the policies in that handbook do not permit harassment or bullying.

Consequently, given the alleged actions of the tennis team, Coach Ketchem and Cardinal Mooney administration, the Cooks assert that there was a breach of this contract.

{¶15} In support, the Cooks raise three issues that we must examine. The first is whether the handbook prohibited harassment and bullying. The second is whether the handbook constitutes a contract. And the third is whether Cardinal Mooney's actions constituted a breach of the alleged contract.

1. Does the handbook prohibit harassment and bullying?

{¶16} The Cardinal Mooney hand book states the following:

**Mission Statement**

Cardinal Mooney High School, a Roman Catholic school of the Diocese of Youngstown, Ohio, is committed to providing a quality education in the supportive atmosphere of the Mooney Family. Our embrace of Gospel values, and our tradition of sanctity, scholarship, and discipline, enable our students to achieve personal excellence. We strive to develop leaders dedicated to social justice and service in the world community.

**Philosophy of Education**

Cardinal Mooney is a Catholic high school whose community of students and their families, teachers, administrators, support staff, and alumni take pride in the school's 'family atmosphere' and its purpose to live and proclaim the Gospel of Jesus Christ. The high school responds to the needs of its members by providing an enriching environment to help students grow intellectually, spiritually, and personally.

Cardinal Mooney educates students through steadfast traditions of scholarship, sanctity, and discipline -- traditions that have been highly valued since the school's inception. Through worship, learning, athletic, and extracurricular activities the goal is personal excellence and integrity.

\* \* \*

**Cardinal Mooney High School Belief Statements**

1.  Catholic beliefs, which commit us to live the values of the Gospel and the teachings of Jesus Christ, are the foundation of our school experience.

2.  The Gospel values and the teachings of Jesus Christ call the members of the Mooney family to live a life of service and to commit to the practice of social justice.

3.  The foundations and traditions of Cardinal Mooney High School, which include sanctity, scholarship, discipline and a tradition of excellence, are an integral part of the mission of our school.

4.  Each member of the Mooney Family is unique and plays an important role in building our tradition of excellence, which provides all members the opportunity to develop their spiritual, academic, social and personal potential.

5.  We value the diversity of people and encourage acceptance by creating a family atmosphere in which each person is treated with dignity and respect.

6.  All staff members serve as role models for the values we hold.

Exhibit A attached to complaint.

**{¶17}** These statements are alleged to prohibit intimidation, harassment and/or bullying. This is a plausible interpretation of these policies and principles. Under the applicable standard of review, we are to view the evidence in the light most favorable to the nonmoving party. Therefore, for purposes of summary judgment the handbook does establish a policy against harassment, intimidation and/or bullying.

### 2. Does the handbook create a contract?

{¶18} Having found that the handbook could be interpreted to prohibit bullying, harassment and/or intimidation, our focus turns to whether the handbook created a contract between the Cooks and Cardinal Mooney.

{¶19} The Ohio Supreme Court has not stated whether a private school's handbook creates a contract between the school and the student. However, our sister courts have explained that in breach of contract actions between an individual and the private school, the contractual terms may be expressed in the school's policies and handbook. *Frazier v. Cincinnati Sch. of Med. Massage*, 1st Dist. No. C-060359, 2007-Ohio-2390, ¶ 28; *Riley v. St. Ann Catholic Sch.*, 8th Dist. No. 78129, 2000 WL 1902430 (Dec. 21, 2000); *Iwenofu v. St. Luke School*, 132 Ohio App.3d 119, 128, 724 N.E.2d 511 (8th Dist.1999); *Ray v. Wilmington College*, 106 Ohio App.3d 707, 712, 667 N.E.2d 39(12th Dist.1995); *Allen v. Casper*, 87 Ohio App.3d 338, 343, 622 N.E.2d 367 (8th Dist.1993). These courts specifically use the word "may." There is no clear indication in any of them that the school's policies and handbook conclusively establish a contract between the student and the school. In fact, in *Iwenofu*, the court specifically stated that because it found that school acted consistently with those handbook policies, it did not need to address the question whether that manual constituted a contract. *Iwenofu* at 128-129.

{¶20} Thus, the appellate courts that have considered this issue have determined that there is no breach and thus, those courts decline to conclusively decide if the handbook created a contract. Here, the magistrate and the trial court followed that example. We are likewise going to forego deciding at this point whether this handbook created a contract and instead move to whether not there is a genuine issue of material fact as to whether there was a breach of this alleged contract.

### 3. Is there a breach?

{¶21} When determining whether there is a breach, our sister districts have explained that the school has a broad amount of discretion; in order for the student to state an actionable claim the student "must adduce evidence of a violated contractual right or evidence that the school clearly abused its discretion in enforcing its policies and regulations." *Frazier* at ¶ 28. See also *Iwenofu*, *Ray*, *Allen*, and *Riley*.

Private schools have the right to make regulations, establish requirements, and set scholastic standards largely as the responsible governing board shall decide. And "compliance with scholastic standards and disciplinary requirements are enforced within a broad range of discretion * * * [and] courts will not interfere in these matters in the absence of a clear abuse of discretion by the governing board." The abuse-of-discretion standard implies "a lack of evenhanded justice in the administration of the [private school's] regulations" * * *.

Thus, courts should only intervene on behalf of the student in the following limited cases: "(1) where the evidence on its face and without consideration of the purpose of the private educational contract shows that the private school clearly violated the terms of that contract; or (2) where the private school clearly abuses its discretion in applying its disciplinary standards in such a manner as to depart from the purpose of the educational contract and rise to the level of a breach of that contract."

*Frazier* at ¶ 29-30. See also *Iwenofu*, *Ray*, *Allen*, and *Riley*.

**{¶22}** Cardinal Mooney agrees that it has broad discretion in the educational setting and that its use of such discretion is reviewable by the court system. However, since the conduct alleged to have violated the handbook arose out of participation in an extracurricular activity, Cardinal Mooney asserts that it is afforded even greater discretion than espoused in the above cited cases and that discretion should not be afforded review by the court system. It cites the following statement in its handbook as support for this position:

**{¶23}** "Participation in co-curricular and extra-curricular activities is a privilege, not a right."

**{¶24}** We disagree with Cardinal Mooney's position. Admittedly, the above cases deal with expulsion from a private school because of disciplinary action taken in the educational setting; the discretion being reviewed in those cases was not discretion related to an extracurricular activity. However, for purposes of the school's discretion and the reviewability of that discretion, we find no distinction between an

extracurricular activity and the educational setting at a private school. Having a rule of law that the school's exercise of discretion regarding extracurricular activities is not actionable against a private school may lead to a situation where egregious conduct on the part of the coach and or administration may not be able to be resolved through the court system. Furthermore, we find Cardinal Mooney's assertion that since an extracurricular activity is privilege the school's exercise of discretion regarding that activity is not actionable is illogical. A private school's exercise of discretion in the education setting is actionable. Attending a private school is a privilege, not a right. Not all children can get into private schools and/or afford it. Thus, just because participation in an extracurricular activity is a privilege, does not mean the discretion used by the school associated with that activity may not be actionable.

{¶25} Therefore, we find that a private school is afforded the same amount of discretion for extracurricular activities as it is afforded in the educational setting. Furthermore, the exercise of that discretion is reviewable by the courts.

{¶26} Having resolved that issue, we now turn out attention to alleged conduct that violated the handbook. Rachel lists 22 specific allegations of harassment and/bullying in the appellate brief and contends that there are factual disputes surrounding these allegations which rendered the grant of summary judgment improper. The allegations that have something in common with each other are grouped together for purposes of analysis.

{¶27} The first set of allegations addressed is about the implementation of the Team Rules for the 2009 tennis season:

> In 2009, after select parents complained about Rachel, Ketchem created a set of "Team Rules" for the first time and specifically to punish Rachel.

> Ketchem presented the new Team Rules to Rachel just before her vacation and under circumstances that were deceptive.

> The coach unilaterally interpreted the new Team Rules to classify Rachel's family vacation as an unexcused absence, resulting in Rachel's

suspension for approximately half of the season (later reduced by the athletic director).

Ketchem interpreted the new Team Rules to favor the daughters of selected parents; i.e. Ketchem deemed a college visit to be an excused absence under her rules so that no punishment was necessary.

Although not specified in any rule, Ketchem insisted that Rachel attend the matches from which she was suspended (later reversed by the athletic director).

**{¶28}** In 2008, when Rachel was a freshman on the tennis team, Rachel and her family went on vacation during the season causing her to miss mandatory practices and matches. During that season, she also missed another match because she was studying for three honors tests that were scheduled to be taken the day after the match. At that time there were not any rules in place about suspension from matches when a player misses a match or practice.

**{¶29}** Prior to the start of the 2009 season Coach Ketchem devised rules to govern the consequences for missing practices and/or matches. The rules provided for unexcused misses and excused misses. Unexcused misses of matches would result in the player being suspended from two matches, while an unexcused missed practice required the player to be suspended from one match. The player was still required to attend the match or matches that she was suspended from.

**{¶30}** Coach Ketchem's stated reason for implementing these rules was to prevent what happened the prior season. The players were given the Team Rules at the beginning of the 2009 season and were required to sign the rules and have a parent/guardian sign the rules. The record shows that Rachel received these rules prior to the 2009 family vacation and both her and her mom signed the rules. As a result of the vacation she missed four matches and one mandatory practice. Coach Ketchem deemed the absences to be unexcused. Thus, the Team Rules mandated that Rachel be suspended from nine matches.

**{¶31}** The rules do not speak to the issue of whether a family vacation is an excused or unexcused absence. This is a matter that would be within the coach's discretion. Athletic Director, and former football coach, Donald Bucci testified that if one of his players missed a game for a family vacation that player would be thrown off the team. Such a position cannot be deemed to be per se unreasonable. Therefore, Coach Ketchem's exercise of her discretion to deem the absences at issue here as unexcused is not unreasonable.

**{¶32}** Likewise, there is nothing in the record to suggest that another player went on a family vacation during tennis season and that that absence was an excused absence. While it is true that a senior did miss a practice to visit a college, the Cardinal Mooney handbook clearly states that a senior is permitted one day to visit a college and that day will be considered an excused absence. The Team Rules specifically state that it will follow rules set down by Cardinal Mooney High School. Accordingly, there is no issue that Rachel was treated differently than another similarly situated player.

**{¶33}** Furthermore, the Team Rules were not strictly enforced against Rachel. Rather the rules were bent to benefit Rachel. Due to the absences associated with Rachel's participation in her family's vacation, the Team Rules, if strictly enforced, required her to be suspended from nine matches. The administration and Coach Ketchem reduced that suspension to only three matches. (Ketchem Depo. 121). As explained above, the Team Rules clearly state a player is to attend the matches she is suspended from and that failure to attend will result in further suspensions. Rachel, however, did not attend any of her three suspended matches, but her suspension was not extended. After complaints by her mother, the administration permitted Rachel to miss the matches she was suspended from without any consequences. (Bucci Depo. 182-186).

**{¶34}** Consequently, considering the evidence in the light most favorable to Rachel, we cannot logically conclude that the rules were implemented solely to punish Rachel for going on a family vacation. Moreover, we cannot find that there is a reasonable person who would conclude that Cardinal Mooney's conduct violated the handbook; Cardinal Mooney's actions do not show intimidation and/or harassment.

**{¶35}** The next allegations concerns challenge matches. It provides:

Notwithstanding that the new Team Rules specified that each girl's place on the team would be determined by a round robin challenge match, Ketchem did not permit Rachel to complete against the assistant couch's daughter.

**{¶36}** Challenge matches occur between players of the same team and are used to determine which player is the better player. The Team Rules state that challenge matches are used, in addition to other criteria, to determine the player's position on the team:

**{¶37}** "No matter where anyone ends up on the challenge ladder, positions will be determined by cooperation, attitude, sportsmanship, and good of the team. As the coach, I reserve the right to arrange the lineup (without stacking) in order to give our team the best opportunity to win."

**{¶38}** The positions on the varsity squad are singles one, two and three, and doubles one and two. Singles one denotes the best singles player and doubles one denotes the best doubles team.

**{¶39}** In the 2009 season, the challenge matches lasted a week and occurred during the first week of mandatory practices. Rachel missed the Friday of that week for the family vacation. It is undisputed that she got to play every team member close in her talent level except co-captain Jaclyn DiDomenico, who was a senior and the assistant coach's daughter. Coach Ketchem avowed that given the matches, it was not possible to schedule a challenge match between Rachel and Jaclyn for earlier in the week. (Ketchem Depo. 103-112).

**{¶40}** We cannot find that the lack of a challenge match shows Rachel was harassed or bullied. Coach Ketchem positioned Rachel in the singles one position, the best singles position, after Rachel returned from the vacation and suspensions. (Ketchem Depo. 151). Rachel admitted that she preferred playing singles, rather than doubles. (Cook Depo. 94). Therefore, the logical deduction is that Rachel was happy with her position. Furthermore, Rachel's own testimony does not indicate that she felt bullied or harassed because she did not get the opportunity to play Jaclyn. Rather,

she stated she was merely confused as to why the challenge match did not occur. (Cook Dep. 37). Consequently, it is difficult to deduce how a reasonable person would believe that because Rachel did not play Jaclyn, but was placed in the best singles position upon her return from her suspensions that she was being intimidated and bullied.

{¶41} The next five complaints encompass the players' interactions with Rachel.

The team co-captains called a special team meeting to complain that Rachel was not being appropriately punished. But Ketchem did not tell the team that the athletic director had intervened on Rachel's behalf or otherwise defend Rachel.

The team's co-captain admitted to Ketchem that she sent a threatening text message to Rachel, and yet Ketchem did nothing.

Both co-captains refused to communicate team information to Rachel, which caused Rachel embarrassment and hardship; again Ketchem did nothing.

The team members refused to practice and warm-up with Rachel; again Ketchem did nothing.

The team, with the coach's encouragement (and contrary to Ketchem's own Rules), did not watch Rachel compete or support her while she competed.

{¶42} The team members of the girl's tennis team were aware that Rachel would be suspended from matches for missing practices and matches while she was on vacation. Co-captain Jaclyn DiDomenico texted Rachel telling her to attended the matches she was suspended from to support the team. Rachel viewed the text as threatening. (Rachel Cook Depo. 60-61).

{¶43} The record reveals that the administration looked into whether this was a threatening text; Coach Ketchem questioned Jaclyn and reported back to Sister Jane

Marie, the principle. (Sister Jane Marie Depo. 60). Jaclyn told Coach Ketchem that the text was a reminder and was not intended to be threatening. Id. Jaclyn indicated that all her other texts to Rachel typically consisted of what uniform to wear. (DiDomenico Depo. 82-83, 107-108). Jaclyn also indicated that following that incident she no longer communicated with Rachel or Mary Ann Cook. (DiDomenico Depo. 111). It was not only because of how the text was perceived, but was also because of actions taken by Mary Ann Cook against Jaclyn that Jaclyn perceived as intimidating. (DiDomenico Depo. 82-83, 108-109 (Mary Ann Cook allegedly said to the Coach that Jaclyn did not deserve her position, Mary Ann Cook continued to point a video camera on Jaclyn Court's after being told to stop and Mary Ann Cook followed Jaclyn and a few other girls to the Boardman Tennis Club and watched them practice).

**{¶44}** Since Jaclyn no longer communicated with Rachel, information of what uniform or where to meet had to be obtained from other girls on the team. Jaclyn testified that she explained to the other girls on the team that were close in age to Rachel that she was not going to text Rachel with the information. Likewise, Rachel testified that she sometimes asked another teammates what uniform they were going to wear and that her locker was next to another teammate that she could ask. (Cook Depo. 64). Rachel admitted that she never complained about the lack of communication to the Coach, Sister Jane Marie, or anyone at the high school. (Cook Depo. 62).

**{¶45}** Considering that the administration took action to investigate the alleged threatening text, that it was deemed to nonthreatening and that there was no longer any communication between Rachel and Jaclyn, we cannot find that there is an issue of material fact as to whether Cardinal Mooney breached the handbook.

**{¶46}** Admittedly, the record shows that there was some dissention on the team. Members of the tennis team were upset that Rachel did not attend the matches from which she was suspended. (DiDomenico Depo. 73). However, the record does not clearly disclose that there was bullying or isolation being committed by the team members that the coach and administration were aware of.

**{¶47}** It is true that Jaclyn, as co-captain, asked for a team meeting with Coach Ketchem after the East Palestine match because team members were asking her

about Rachel's suspension and why Rachel was not attending the suspended matches. (DiDomenico Depo. 73, 78). This match occurred on August 26 (Wednesday) and was one of the matches Rachel was suspended from. (Exhibit C Bucci Depo.) Coach Ketchem told the players that she did not know why Rachel was not there. (DiDomenico Depo. 80).

{¶48} That statement to the players was accurate at the time it was given. According to Ketchem's deposition, she had a meeting with Mary Ann Cook and athletic director Bucci. (Ketchem Depo. 137). The meeting was partially about Rachel attending the matches she was suspended for. (Ketchem Depo. 143). At the end of the meeting, Coach Ketchem believed that Rachel would have to attend the matches she was suspended for; she prepared a letter dated August 27, 2009 that indicated as such. However, the next day Coach Ketchem was informed that Rachel would be playing in the Monday August 31 match, that Rachel was not required to attend matches she was suspended for, and thus her suspension was not extended. (Ketchem Depo. 150-151). Coach Ketchem indicated in her deposition that on the day Rachel returned from the suspension, the girls asked why she was playing and she indicated "that the administration had said that Rachel needs to be back in the line-up." (Ketchem Depo. 152-153).

{¶49} The fact that the players questioned what was going on with Rachel when the rules specifically stated that she was to attend matches from which she was suspended does not show intimidation. It does potentially show that the atmosphere was ripe for dissention on the team, but that does not necessarily result in intimidation and bullying.

{¶50} Rachel did testify that one of her teammates refused to warm up with her. (Cook Depo. 96). However, she admitted that she never complained about this occurrence to Coach Ketchem or the administration. (Cook Depo. 97). She also admitted that a couple of times she warmed up with Nicolette, a teammate. (Cook Depo. 97). Coach Ketchem stated that Nicolette and Rachel had become "buddies" by the end of the season. (Ketchem Depo. 260). That said, Rachel indicated that often warmed up with her brother. Coach Ketchem testified that she assumed that Rachel and her mom wanted Rachel to warm up with her brother. (Ketchem Depo. 262).

**{¶51}** The fact that one teammate did not want to warm up with her and that she often warmed up with her brother does not show that her teammates were bullying, intimidating or isolating her. Thus, since Nicolette was warming up with her and there was some sort of observable friendship there, it cannot be deemed that the team as a whole was isolating her. However, even if there was some isolation, it was perceived by Coach Ketchem that that was what Rachel wanted. Rachel even confirmed this by testifying that she did not feel like she had anything in common with the girls on the team. (Cook Depo. 14).

**{¶52}** There is an allegation that Coach Ketchem encouraged the team to not support her during her matches. However, Rachel testified that she never heard Coach Ketchem encourage the others to not support her. (Cook Depo. 53-54). Rather her testimony was that her mother and the lawyers present told her that Coach Ketchem encouraged others to not support her; allegedly Coach Ketchem, while Rachel was playing doubles, walked away from the court Rachel and her teammate were playing on. (Cook Depo. 53-54, 79).

**{¶53}** Considering other testimony presented it was not uncommon for the teammates to watch part of match and then move on and either eat or go support another teammate. Jaclyn testified that during the matches they are expected to support each other and they would normally sit in the middle of the rows of the courts and watch. She also explained that it is not uncommon for the girls when they are done with a match to walk away and eat. She also indicated that she watched Rachel's matches to support her. She also indicated that she never observed the girls walk away from Rachel while she was playing other than to get food or go support another teammate for awhile. (DiDomenico Depo 93-95).

**{¶54}** Given the above discussed testimony, the actions of Rachel's teammates and the administrations lack of knowledge of some of the alleged actions does not create a genuine issue of material fact that Cardinal Mooney breached the handbook. The actions that it knew about it investigated and some resolution occurred. Thus, even one teammate's refusal to warm up with her once and Jaclyn's refusal to communicate with her did not rise to the level of harassment, bullying or isolation that is actionable.

{¶55} The next set of allegations concern Coach Ketchem's actions that are perceived to be punishing/intimidating/harassing Rachel.

Ketchem started a match early so Rachel could not play on the varsity team contrary to the Tennis Rules. The ostensible reason for this was threatening weather, however, weather reports and video tape show that the weather was not threatening.

Ketchem did not let Rachel play singles (demoted her to doubles after 8/31 match) even though Rachel earned that spot through challenge matches.

Ketchem forced Rachel to choose between academic excellence and athletic excellence. Ketchem punished Rachel for missing a match when she had to study for three honors tests. Ketchem started a match early to punish Rachel when Rachel was meeting with a teacher about academics.

{¶56} These allegations are not supported by the record. It is true that a match was started at 3:45 pm instead of the start time of 4:00 pm or 4:30 pm. Rachel played junior varsity during this match instead of varsity because she was meeting with a teacher and did not know the match was starting early; she arrived after the line-ups were announced. Coach Ketchem alleged that she did not know where Rachel was and Rachel contends that she texted her mom that she was meeting with a teacher. Mary Ann Cook avows that she told two of the teammates that Rachel was meeting with a teacher. Regardless of who knew what, Rachel did not text the Coach to inform her what was going on.

{¶57} The summary judgment evidence establishes that Coach Ketchem and the opposing coach viewed the weather as threatening. The weather report attached to the motion in opposition to summary judgment shows that there was light rain and it was overcast. There were wind speeds around 12 to 15 mph.

{¶58} The Team Rules clearly indicate that while matches are scheduled to start at 4:00 and 4:30, they could get started as early as the opponent arrives. It was

within Coach Ketchem and the opposing coach's discretion. Furthermore, the record is undisputed that other matches started early. (Ketchem Depo. 228). Thus, it cannot be found that this match was purposely started early to punish Rachel.

**{¶59}** As to Rachel being punished for missing a match to study for three honors tests, we note that there was no consequence for that absence. That incident occurred during the 2008-2009 season when there were no rules in place regarding excused and unexcused misses. Rachel avowed that following the incident Coach Ketchem took her aside and talked to her about missing the match and how she let the team down. (Cook Depo. 106). Rachel indicated that Coach Ketchem let her decide whether there would be any consequence, such as not playing varsity the next match, and Rachel decided that there would not be. (Cook Depo. 106). Therefore, she played varsity the next match. (Cook Depo. 106).

**{¶60}** Since Rachel was not prevented from playing in the next match at all or from playing varsity, it is difficult to conclude that any negative treatment occurred toward Rachel. While Coach Ketchem did talk to Rachel, this would be a normal occurrence when a player misses a match.

**{¶61}** The last allegation under this set of claims is that Rachel was allegedly demoted following her first match back after her suspension. As previously discussed, in the 2009 season following Rachel's family vacation and three game suspension, Rachel played first singles in her first match back. Following that match, Rachel asked Coach Ketchem what position she would be playing in the next match. She was told first doubles or first or second singles. (Cook Depo. 94; Ketchem Depo. 156). A heated discussion then occurred between Coach Ketchem and Mary Ann Cook about whether Rachel would play doubles. Mary Ann Cook stated that her daughter would only play singles and that was the understanding she had with the athletic director. (Ketchem Depo. 156-157).

**{¶62}** This allegation does not contain a basis for denying summary judgment. The position a player plays is within the coach's discretion, not something that should be brought to court each time a player does not get to play the position of his/her choice or the choice of his/her mother. Furthermore, the Team Rules clearly indicate it is up to the coach to determine the player's position on a match by match basis.

There is nothing in the record to suggest that playing first singles then being told to play first doubles is a demotion. It may not be the player's preference, but there is nothing in the record to suggest that doubles are inferior to singles. Thus, it cannot be concluded based on the record that this was a demotion, let alone harassment or bullying by the coach.

**{¶63}** The next two allegations concern Coach Ketchem's decision to use the original line-up for a match that Rachel missed, but was rescheduled due to weather.

Although the Team Rules are completely silent on this point, Ketchem suspended Rachel from a rescheduled match even though the original match had been cancelled. In other words, Ketchem suspended Rachel for failing to attend a match that never took place.

Ketchem and the Principal excluded Rachel from a public announcement identifying the team under circumstances where the student body would have expected Rachel to be included.

**{¶64}** Rachel had missed the match with United Local because she was on vacation. It was Coach Ketchem's decision to keep the original line-up for that match. Her reasoning was because the players had traveled to a far away match and had to wait more than an hour for it to be cancelled on account of the weather. On the rescheduled date, the weather was not very good, so the match got rescheduled to Salem Racquet Club. It was determined that since there were not many courts available it would be only a varsity match. The players who were to play in this match were announced over the loud speaker at school to come to the office. The players were told at that time about the time of the match, where it was to be played, and that they were to meet at Jaclyn's house to caravan to the match. Since Rachel was not in the original line-up her name was not announced over the loud speaker and she did not receive the information on the match. She later received a text that informed her that she was not playing in the match. Rachel was not the only varsity player not called and who was not playing in that match. Erin Boback, who regularly played varsity towards the end of the season was not in the line-up for the rescheduled United

Local match, because like Rachel she was not in the original line-up. (Ketchem Depo. 246).

{¶65} These facts do not create a genuine issue of material fact as to how Rachel was treated differently than other teammates or that the failure to have her play in the rescheduled match rose to the level of harassment or intimidation.

{¶66} The next two allegations raised by Rachel are about her not being told that the caravan to the United Local match was meeting at Jaclyn DiDomenico's house.

> Ketchem arranged a secret meeting, in violation of her own Team Rules, at Carol DiDomenico's house to the exclusion of Rachel.

> Ketchem, in violation of her own Rules, excluded Rachel from the carpool and/or did not inform Rachel of its cancellation.

{¶67} There is no support in the record that there was a secret meeting at Carol DiDomenico's house. The testimony clearly establishes that they did not talk about Rachel or Mary Ann Cook. (Ketchem Depo. 250; Jaclyn DiDomenico Depo. 129).

{¶68} There is also no dispute that Rachel was not told about the change in the carpool. However, she was told that she was not playing on that day. Thus, there was no need to inform her of the caravanning details.

{¶69} Accordingly, we cannot find that these allegations create a genuine issue of material fact as to whether Rachel was harassed or bullied by the Coach Ketchem and/or the girls' tennis team.

{¶70} The next three allegations reference Coach Ketchem and the administration's handling of personal problems between the teammates and the personal problems between the parents of the teammates:

> Ketchem, at the insistence of the favored parents, embarked on a concerted effort to punish Rachel for valuing her family and attending a family vacation.

Ketchem refused to acknowledge or address interpersonal problems on the team.

The school administration did nothing to assist Rachel or to address the concerted effort to disadvantage Rachel.

**{¶71}** As previously stated, the record clearly indicates that the administration and Coach Ketchem reduced the number of suspensions from nine to three and then did not require Rachel to attend the suspended matches. The record also indicates that Coach Ketchem made it a point to inform Mary Ann Cook that it was important to the players on the team that Rachel attend the matches she was suspended from. Furthermore, the school met with Mary Ann Cook to address her concerns about the suspension and the tennis team. (Bucci Depo. 200; Ketchem Depo. 137; Sister Jane Marie Depo. 57). Thus, the evidence undisputedly shows that the school did assist Rachel and did address Mary Ann Cook's concerns relating to her daughter's participation on the team.

**{¶72}** The last allegation involves videotaping:

The Principal acquiesced to the demands of the select parents while refusing to address Mrs. Cook's concerns, specifically by requiring Mrs. Cook to stop videotaping Rachel.

**{¶73}** The depositions reveal that Mary Ann Cook was told to stop videotaping because it was believed that she was videotaping Jaclyn DiDomenico. During the depositions the Cooks made it a point to indicate that there was no proof that Mary Ann Cook was actually videotaping. However, Coach Ketchem and Jaclyn DiDomenico testified that the camera was pointed at Jaclyn's court, not Rachel's court.

**{¶74}** We cannot conclude that Cardinal Mooney's exercise of its discretion to prohibit Mary Ann Cook from pointing the video camera at Jaclyn was unreasonable. The testimony presented through depositions shows that two people witnessed Mary Ann Cook pointing the camera at Jaclyn. This evidence is not disputed beyond a self-serving allegation that it is untrue. Furthermore, even if Mary Ann Cook was prohibited from videotaping Rachel it is unclear how this was the result of harassment or bullying

of Rachel. Therefore for those reasons, we do not find that this allegation creates a genuine issue of material fact as to bullying or intimidation of Rachel.

**{¶75}** In sum, considering all 22 allegations, the majority of them go to the fact that Rachel Cook and/or Mary Ann Cook did not like the Team Rules, did not like the Coach's exercise of discretion, and wanted Rachel to play a certain position. The fact that she did not always play first singles is not harassment or intimidation. Furthermore, we cannot find given the evidence presented that the Team Rules were implemented in a way to punish Rachel; they were implemented for the benefit of the whole team. Moreover, we additionally note that it is undisputed that the rules were bent to Rachel's favor.

**{¶76}** Both Coach Ketchem and Principle Sister Jane Marie indicated that there were parent issues on the tennis team. Principle Sister Jane Marie testified:

> Q. And when you say they, are you talking about the parents, that the parents were not upset with Rachel?
>
> A. I'm saying, in general, my perception of the situation is that people were not speaking about Rachel; people were speaking about Mrs. Cook.
>
> Q. Okay. But if morale on the team was low –
>
> A. Morale was – morale on the team was low because rules had been put in place and they weren't being enforced; and also because of the fact that Mrs. Cook had attacked Sandy Ketchem, and the girls were upset by that.

(Sister Jane Marie Depo. 77-78). Coach Ketchem indicated that parents were not angry with Rachel but rather with the situation and Rachel was in the middle of it. (Ketchem Depo. 201).

**{¶77}** The issues Mary Ann Cook and Rachel complained of do not rise to the level of being actionable. There is no evidence that there was ever any physical harm to Rachel, that the Coach displayed anger towards her, and that Rachel heard the

Coach tell anyone to intimidate and isolate her. (Cook Depo. 103-105). The trial court's decision states it best why this claim, given the evidence, is not actionable:

> Indeed, the record reflects that the Team Rules were drafted for the good of the team, and not for the benefit – or determinant- of any one player. Moreover, both the rules and their subsequent implementation by Ketchem and school administrators were not so onerous as to lead a reasonable person to conclude that the Defendants breached any duty owed to Plaintiffs.
>
> * * *
>
> The testimony, along with additional evidence submitted by Plaintiff, when construed in favor of Plaintiff, fails to demonstrate any operative facts suggesting that Rachel Cook was subjected to bullying or harassment or intimidation by the Defendants or by students or agents under Defendants control.
>
> From a careful review of the significant evidentiary record in this case, the Court was able to identify one instance in which Rachel believed she was being harassed and/or intimidated by Ketchem. Even when construing the facts surround this one instance in Rachel's favor, the Court cannot conclude that this creates a genuine issue of material fact for a jury.
>
> While this Court is mindful of the potential sensitivities of an adolescent, this Court is also aware that the applicable law of this case does not contemplate a remedy for hurt feelings, whether incurred by an adolescent or by an adolescent's parent(s).

01/25/11 J.E.

{¶78} Summary judgment was appropriately granted on the contract claim because even if there is a contract, the evidence does not establish a breach by the alleged intimidation/harassment claims.

<u>Fiduciary Duty</u>

**{¶79}** The next cause of action asserted against Cardinal Mooney is breach of a fiduciary duty. Recently, we have explained the fiduciary relationship as follows:

In Ohio, a "fiduciary" is "a person having a duty, created by his undertaking, to act primarily for the benefit of another in matters connected with his undertaking." (Emphasis omitted.) *Evans v. Chambers Funeral Homes,* 8th Dist. No. 89900, 2008-Ohio-3554, ¶21, citing *Strock,* 38 Ohio St.3d 207. A "fiduciary relationship" is formed when "special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtue of this special trust." *In re Termination of Emp. of Pratt* (1974), 40 Ohio St.2d 107, 115.

The fiduciary's role may be assumed by formal appointment or it may arise de facto from a more informal relationship between the parties. For the de facto status to be recognized, however, both parties must understand that under the circumstances, a special trust and confidence has been reposed in one by the other. *Blon v. Bank One, Akron, N.A.* (1988), 35 Ohio St.3d 98. However, "a mere friendship in which a person renders gratuitous assistance to a friend does not give rise to a confidential or fiduciary relationship." *In re Estate of Hill* (March 15, 2000), 4th Dist. No.99CA2663.

Despite the apparently broad definition of the term "fiduciary" in Ohio, a review of the case law reveals that courts have been reluctant to characterize relationships between individuals as being fiduciary in nature, with the obvious exception of those relationships that involve statutorily-imposed duties. See, e.g., *State Farm Fire & Cas. Co. v. Century 21 Arrow Realty,* 8th Dist. Nos. 87081 and 87108, 2006-Ohio-3967, ¶32; *Horning v. Fletcher,* 7th Dist. No. 05 MA 7, 2005-Ohio-7078, ¶12.

Courts have required complete dependence by the inferior party in order to recognize the de facto status. See *In re Estate of Svab* (1966), 8 Ohio App.2d 80, 88 (daughter is fiduciary where mother's eyesight prevented her from reading joint-and-survivorship documents); but see *Hill,* (fiduciary relationship between relatively independent uncle and niece began when parties executed power of attorney); and *In re Case* (Apr. 3, 1998), 2nd Dist. No. 16747, (same).

*Casey v. Reidy*, 180 Ohio App. 3d 615, 2009-Ohio-415, 906 N.E.2d 1139, ¶ 33-36 (7th Dist.).

**{¶80}** There is no case that provides that a coach would definitely have a fiduciary relationship with the player. Likewise, it is difficult, if not impossible to find that a de facto relationship was created. Here, Rachel readily admitted that she did not tell anyone at high school, including her coach, that she felt she was being intimidated. She stated she did not trust them. (Cook Depo. 112-113).

**{¶81}** That said, even if a fiduciary relationship had been created, for the same reasons expressed above as to why there was not a breach of contract, there likewise was not a breach of the fiduciary duty. The conduct asserted to be intimidation did not rise to a level of intimidation and thus, there could be no breach of a duty to protect from that kind of conduct. Thus, summary judgment was also correct on this claim.

Negligence and Negligent Supervision

**{¶82}** The third and fourth claims against Cardinal Mooney are negligence and negligent supervision.

**{¶83}** The essential elements for a negligence claim consist of duty, breach of duty, and damage or injury that is proximately caused by the breach. *Winkle v. Zettler Funeral Homes, Inc.,* 182 Ohio App.3d 195, 2009–Ohio-1724, 912 N.E.2d 151, ¶ 46 (12th Dist.). The failure of any of these elements will defeat the action.

**{¶84}** The elements of negligent supervision are: 1) an employment relationship, 2) incompetence of the employee, 3) actual or constructive knowledge of the incompetence by the employer, 4) an act or omission by the employee which caused the plaintiff's injuries, and 5) negligent retention of the employee by the

employer, which action is the proximate cause of the plaintiff's injuries. *Crable v. Nestle USA, Inc.*, 8th Dist. No. 86746, 2006-Ohio-2887, ¶ 39.

**{¶85}** The Cooks contend that Cardinal Mooney was negligent in preventing the harassment and in the supervision of Coach Ketchem. As aforementioned, neither the Team Rules, their implementation, nor the conduct that occurred after would lead a reasonable person to conclude that Cardinal Mooney breached any duty owed to the Cooks.

**{¶86}** Furthermore, as discussed at length above, the Team Rules were not strictly enforced against Rachel. She was not suspended from the full amount of matches as required by the rules (Coach Ketchem reduced that amount) and she was not required to attend the matches she was suspended from (the Administration determined this was not required). The record also shows that Rachel more often than not played singles one or two or doubles one – the highest positions on the team. The only indication that she played junior varsity was when she was late for a match. While there are statements that the girls on the team were upset that the rules were not enforced against Rachel, there is no indication from the testimony that they bullied her in any manner. Thus, summary judgment was also appropriately granted on these claims.

Intentional Infliction of Emotional Distress

**{¶87}** The fourth claim against Cardinal Mooney is intentional infliction of emotion distress. The elements of intentional infliction of emotional distress are as follows: intentionally or recklessly causing severe emotional distress through extreme and outrageous conduct. *Baghani v. Charter One Bank F.S.B.*, 8th Dist. No. 91373, 2009-Ohio-490, ¶ 21.

**{¶88}** The trial court held:

> Cook's claim for Emotional Distress requires, among other things, that Cook demonstrate that the Defendants' conduct was so extreme and outrageous, that it exceeded all possible bounds of decency and that it can be considered utterly intolerable in a civilized community. In reviewing the testimony of the purported victim of the alleged outrageous

conduct, this Court cannot conclude that Defendant's acted in a way that would lead a reasonable person to conclude that it was extreme or that it went beyond the bounds of decency.

The testimony, along with the additional evidence submitted by Plaintiff, when construed in favor of Plaintiff, fails to demonstrate any operative facts suggesting that Rachel Cook was subjected to bullying or harassment or intimidation by the Defendants or by students or agents under Defendants control.

01/25/11 J.E.

**{¶89}** The evidence already discussed supports the trial court's decision; there is no indication that Rachel was harassed or intimidated. From the record it appears that there was little interaction between the other teammates and Rachel. We cannot find that the teammates' conduct that was discussed, a text message to show up to a meet she was suspended from and one girl's refusal to warm up with her, is extreme or outrageous conduct.

### Civil Conspiracy

**{¶90}** The final cause of action the Cooks asserted against Cardinal Mooney is civil conspiracy. The elements of a civil conspiracy claim are: "(1) a malicious combination, (2) involving two or more persons, (3) causing injury to person or property, and (4) the existence of an unlawful act independent from the conspiracy itself." *State ex rel. Fatur v. Eastlake,* 11th Dist. No.2009–L–037, 2010–Ohio–1448, ¶ 45, quoting *Gibson v. City Yellow Cab Co.* (Feb. 14, 2001), 9th Dist. No. 20167, 2001 WL 123467 (Feb. 14, 2001). "An underlying tort is necessary to give rise to a cause of action for conspiracy." *Ohio Ass'n of Pub. School Emps./AFSCME Local 4, AFL–CIO v. Madison Local School Dist. Bd. Of Edn.,* 190 Ohio App.3d 254, 2010–Ohio–4942, 941 N.E.2d 834, ¶ 62 (11th Dist.) quoting *Stiles v. Chrysler Motors Corp.* (1993), 89 Ohio App.3d 256, 266, 624 N.E.2d 238 (6th Dist.1993).

**{¶91}** There is no remaining viable underlying tort, thus, summary judgment was appropriately granted on the civil conspiracy claim.

## CONCLUSION

**{¶92}** In conclusion, for the sound reasoning provided in the magistrate and trial court's decisions, the grant of summary judgment on the Cooks' claims against Cardinal Mooney are hereby affirmed.

Waite, P.J., concurs.
DeGenaro, J., concurs.