[Cite as *D.T. v. St. Gabriel Consol. School*, 2016-Ohio-784.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

D.T., a Minor, by and through his :      APPEAL NO. C-150640
Parents Darryl T. and Candace T.,        TRIAL NO. A-1501513

                :

     Plaintiff-Appellant,           *O P I N I O N.*

                :

     vs.

                :

ST. GABRIEL CONSOLIDATED
SCHOOL,                 :

     Defendant-Appellee.           :

Civil Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal:  March 2, 2016

*Flagel & Papakirk*, *LLC*, and *Hallie S. Borellis*, for Plaintiff-Appellant,

*Dinsmore & Shohl, LLP, Mark A. Vander Laan* and *Andrew B. Cassady*, for
Defendant-Appellee.

Please note:  this case has been removed from the accelerated calendar.

**DEWINE, Judge.**

{¶1} The parents of a student are unhappy about a one-day suspension their son received. We are asked to decide whether a handbook was a contract governing the private school's disciplinary procedure and whether a principal's decision to suspend the student violated that contract. We conclude that this handbook was not a contract and that, even if it was a contract, the principal did not violate its provisions.

## I. Background

{¶2} The incident that precipitated this lawsuit happened during morning snack break in a seventh-grade classroom at St. Gabriel Consolidated School ("St. Gabriel"). D.T. and another boy stared at a girl while walking toward her, eventually backing her into a corner. No teachers were in the room at the time. The boys' actions made the girl feel "very uncomfortable and fearful," as she told her parents that night. The next day, her parents sent a letter to the school about the incident. Nicole Brainard, the principal, was away from the school that day, so the seventh-grade teachers looked into the incident. After speaking with the girl and the two boys, the teachers contacted Brainard and asked that she address the matter when she got back to school. The boys, who had been told by the teachers to read the handbook, wrote a letter apologizing for intimidating the girl.

{¶3} Ms. Brainard conducted her own investigation the next day. She spoke with the girl and the two boys. According to Brainard, she "weighed all the pieces that I had been told by [the children]. I took all of that into account, used that in conjunction with the handbook and made the determination that discipline was necessary in this case." She further determined that the boys' behavior had been intimidating to the girl and that a one-day suspension for each boy was the appropriate punishment.

{¶4} Because it was early in the school year, Ms. Brainard decided to have D.T. serve his punishment the following day, so as to lessen the academic impact of the suspension. She telephoned D.T.'s mother to inform her about his impending suspension. D.T.'s mother was upset. Ms. Brainard "made several offers to schedule a due-process hearing," but D.T.'s mother declined to schedule, saying "she'd let [Brainard] know after she spoke to her attorney." In a second phone call that afternoon, D.T.'s mother requested a hearing.

{¶5} The hearing was set for the following day—the same day D.T. would serve his suspension. In attendance were Brainard, D.T.'s parents and two teachers. Although the timing of the hearing made reversal of the actual suspension impossible, Ms. Brainard did allow that she would consider removing the suspension from D.T.'s record and changing any academic penalty. Following the hearing, Ms. Brainard decided that the suspension would remain on D.T.'s record. The family appealed to one of the pastors to whom Brainard reported and then to the Archdiocese of Cincinnati but were unsuccessful. Unwilling to let the matter go, the family sued the school.

{¶6} In the lawsuit, the family sought a declaration that the school handbook was a contract between them and St. Gabriel and that Brainard's discipline of D.T. amounted to a breach of the contract. Following a bench trial, the trial court declined to determine whether the handbook was a contract, concluding that even if it was a contract, Brainard's action had not violated the terms of the handbook.

## II. The Handbook is Not a Contract

{¶7} In his assignments of error, D.T. claims that the court erred when it refused to declare that the handbook was a contract and that the court's finding that the discipline did not violate the terms of the handbook was against the manifest weight of the evidence.

{¶8}     Judges are less suited than trained school administrators to decide matters of school discipline.  Thus, as a general rule, "[c]ourts do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values." *Epperson v. Arkansas*, 393 U.S. 97, 104, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968).  With this backdrop of deference to educational professionals regarding disciplinary matters, courts have been hesitant to decide that a school handbook constitutes a contract between a student and a school.  While allowing that a handbook *may* be a contract, courts have pushed the issue to the side and have resolved questions of school discipline by determining that no handbook provisions were violated.  *See Iwenofu v. St. Luke School*, 132 Ohio App.3d 119, 724 N.E.2d 511 (8th Dist.1999); *Cook v. Kudlacz*, 7th Dist. Mahoning No. 11 MA 34, 2012-Ohio-2999.  But in this case, we can answer the issue squarely.  Our review of St. Gabriel's handbook leads us to conclude that it was not a contract.

{¶9}     "A contract is a promise or a set of promises for the breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty."  1 Restatement of the Law 2d, Contracts, Section 1 (1981).  St. Gabriel's handbook does not contain any promises on behalf of the school.  The first page of the handbook, which has an area for the student and parents to sign, states, "Your signatures means [sic] that you have read the handbook and agree to follow the policies and procedures as printed."  No reciprocal obligation is established on the part of the school.  In the discipline section, the handbook provides, "Students and parents sign the code of conduct yearly at the beginning of the school year.  If either party cannot agree to this code, educational placement should be sought at another school."

**{¶10}**   The handbook is similar in this regard to the employee handbook in *Alexander v. Columbus State Community College*, 10th Dist. Franklin No. 14AP-798, 2015-Ohio-2170.  There, the Tenth Appellate District found that because the handbook lacked an indication of mutual promises, it was "merely a unilateral statement of rules and policies which creates no rights or obligations."   *Id.* at ¶ 20.  *See Napier v. Centerville City Schools*, 157 Ohio App.3d 503, 2004-Ohio-3089, 812 N.E.2d 311 (2d Dist.) (concluding an employee handbook was not an implied contract).  Likewise, St. Gabriel's handbook is a one-sided statement of the school's policies and rules of conduct. The unilateral nature of the handbook is emphasized by a single statement on the last page:  "The principal retains the right to amend the handbook for just cause, and that [sic] parents will be given prompt notification if changes are made."  The trial court did not err when it refused to declare the handbook a contract.

**{¶11}**   The court was also correct in its conclusion that even if the handbook was a contract between the parties, the school did not violate any of its provisions. D.T. appears to take issue with the extent of Brainard's investigation and her conclusion drawn from the investigation.  But D.T. points to no specific provision violated by Brainard, and our review of the handbook finds none.  Nothing in the handbook prescribes the "investigation" that must be conducted in disciplinary matters.  After speaking with the children involved, Ms. Brainard determined that D.T.'s behavior was "intimidation."   According to the handbook, "[t]hreatening or intimidating acts toward another person" is "unacceptable behavior that could cause suspension or expulsion."   The trial court's finding that Brainard had acted in accordance with the handbook was supported by the record.  The assignments of error are overruled.

## IV. Conclusion

{¶12}    D.T.'s parents are upset that their son was suspended from school. Another principal may have handled the matter differently.  But for good reason, our review of a school's disciplinary decisions is limited.  It is not this court's place to insert itself into the daily decision-making of school administrators.  Because the school was not contractually obligated to take a different approach, the court properly entered judgment in favor of the school.

{¶13}    The judgment of the trial court is affirmed.

Judgment affirmed.

**HENDON, P.J.,** concurs.
**CUNNINGHAM, J.,** concurs in judgment only.

Please note:

The court has recorded its own entry on the date of the release of this opinion.