[Cite as *Hawes v. Downing Health Technologies, L.L.C.*, 2022-Ohio-1677.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

SHANE HAWES,                                  :

    Plaintiff-Appellee,                    :

                                    No. 110920

    v.                                     :

DOWNING HEALTH TECHNOLOGIES
L.L.C., ET AL.,                               :

    Defendants-Appellees,                  :

[Appeal by Michael Shaut,                     :

    Defendant-Appellant.]                  :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED IN PART; REVERSED IN PART;
              VACATED IN PART; AND REMANDED
**RELEASED AND JOURNALIZED:** May 19, 2022

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-16-857599

---

## *Appearances:*

Morganstern MacAdams & DeVito Co., L.P.A., and
Christopher M. DeVito, *for appellee* Shane Hawes.

Cohen Rosenthal & Kramer LLP, Ellen M. Kramer, and
Joshua R. Cohen, *for appellant*.

FRANK DANIEL CELEBREZZE, III, J.:

**{¶ 1}** Appellant Michael Shaut ("Shaut") appeals the decision of the Cuyahoga County Court of Common Pleas entering judgment against him and awarding compensatory damages, punitive damages, and attorney fees to appellee Shane Hawes ("Hawes") following a bench trial. After a thorough review of the facts and applicable law, we affirm in part, reverse in part, vacate in part, and remand to the trial court.

## I. Factual and Procedural History

**{¶ 2}** This case arose from Hawes's investment in and former employment with a company known as Downing Health Technologies, LLC f.k.a. Downing Digital Healthcare Group, LLC n.k.a. 3SI ("Downing Health").

**{¶ 3}** Defendant Downing Partners, LLC ("Downing Partners") owns a majority interest and operates Downing Health and a pooled investment fund of affiliated companies through defendant Downing Investments, LLC ("Downing Investments"). Downing Investments' general manager is defendant David Wagner ("Wagner"). Downing Investments, through its ownership and the control of Wagner, owns and operates other business entities known as Downing Partners, Downing Health n.k.a. 3SI, and the "portfolio companies" of defendant Surgical Safety Solutions, LLC ("SSS") and defendant IVC Healthcom, LLC ("IVC").

**{¶ 4}** SSS is a portfolio company that has been merged into 3SI and/or is controlled and operated by 3SI or the other parent corporations known as Downing Investments and its general partner Downing Partners through Wagner. IVC is a

portfolio company that has been merged into 3SI and/or is controlled by the other parent corporate entities Downing Partners and Downing Investments through Wagner.[1]

**{¶ 5}** Shaut was president of Downing Investments and had invested $500,000 into the business. Shaut also had ownership, directly or indirectly, and management responsibility with respect to the other related Downing entities, including Downing Health. Defendant Marc Lawrence ("Lawrence") was the president and chief operating officer of Downing Health and had ownership, directly or indirectly, and management responsibility at the other related Downing entities. Wagner is the majority owner, chairman, and general manager of Downing Investments.

**{¶ 6}** In 2014, Hawes was seeking a new employment opportunity and was contacted by a recruiter, Peter Boyle ("Boyle"), who put him in touch with Lawrence, who at the time was running a division of Downing Partners. Hawes spoke several times with both Boyle and Lawrence and eventually had a face-to-face meeting with Lawrence.

**{¶ 7}** Lawrence presented him with a summary of the organization known as Downing Health. The document consisted of a slide deck that provided information about the organization for Hawes as both an employee and an investor.

---

[1] The six corporate defendants named in this matter, known as Downing Health, Downing Partners, Downing Investments, 3SI, SSS, and IVC, may be referred to as "corporate defendants."

{¶ 8} After reviewing the slide deck, Hawes spoke with Boyle and some friends who worked in venture capital to get their thoughts on the opportunity. Hawes conveyed to Boyle that he was having second thoughts about being an employee and investor in the company. His concerns were the compensation, which was lower than he felt comfortable with, and the fact that he was required to make a $250,000 investment in the company. Hawes was aware that the company was a "start-up," which made him nervous because start-ups often fail and carry greater risks than an established company.

{¶ 9} The venture capitalists with whom Hawes had spoken did not help him to feel any more comfortable with investing the money because they told him they had not heard of such an arrangement. One of these venture capitalists was Hawes's friend, Joe Renson ("Renson"), who was the chief executive officer of a venture capital firm. Hawes sent Renson some of the documents he had received regarding Downing Health and asked him to review it. Renson advised Hawes against making the investment and working for Downing Health.

{¶ 10} Boyle suggested that he speak with someone else at the company, namely Shaut. Hawes was familiar with Shaut's name from reviewing the Downing Health organizational chart.

{¶ 11} Shaut and Hawes met at a Starbucks for approximately 45 minutes. The two did not discuss the business operations of the company or any employment matters, such as salary or bonuses. Instead, the discussion was focused on the strategy and legitimacy of the company and the opportunity to "really make some

serious money." Hawes found Shaut to be very honest and upbeat about where the organization was going.

{¶ 12} Prior to Hawes's hiring, Downing Health had failed to make payroll at least once. Shaut did not reveal this information to Hawes at their meeting.

{¶ 13} Ultimately, Hawes decided to move forward with Downing Health, and in October 2014, he signed a two-year employment offer letter with Downing Digital Healthcare Group, LLC, which later became known as Downing Health Technologies, LLC, to serve as vice president of business development. Downing Health has since merged and is now known as 3SI, which is controlled or owned by Downing Investments and its general partner, Downing Partners. In addition, 3SI is now a combination of other Downing portfolio entities known as SSS and IVR.

{¶ 14} Regarding his responsibilities, Hawes's employment agreement provided as follows:

> Your responsibilities may vary from time-to-time, but will be consistent with the following outline of your general responsibilities: Achieve assigned sales budgets for all portfolio businesses. Develop and implement a business plan for the region to include sales support from the portfolio businesses, channel development and key account strategies including IDN/GPO contracting. Establish business activities with channel partners to include[:] sales support, monthly forecasting, and quarterly business reviews. Manage a 30, 60, 90 day rolling forecast.

{¶ 15} Section 3 of the employment agreement addressed Hawes's compensation and stated:

> Your base compensation will be two hundred twenty-five thousand dollars ($225,000.) per annum. Additionally, you will participate in the commission plan. Variable compensation is fifty thousand dollars

($50,000) per annum at your assigned budget. Stretch compensation up to an additional twenty-five thousand dollars ($25,000) per annum exceeding budget.

{¶ 16} Hawes was further entitled to certain benefits under the contract, which stated that "[t]he cost of [his] health benefits (PPO Health plan and Dental plan) will be covered 100% by [Downing Health] during the first year of employment."

{¶ 17} Hawes also signed an investment document titled "Series C Preferred Units & Warrant Purchase Agreement" agreeing to invest $250,000 in Downing Health for 23,474 units of the company valued at $10.65 per unit. Hawes's wife signed this agreement as well because she and Hawes jointly purchased the interest in the company.

{¶ 18} Hawes testified that, prior to making the investment, he had read the "Downing Health Private Offering Memorandum," which reinforced this message of inherent risk, as it explicitly indicated that Downing Health might not be able to raise all the money needed to implement its business plan — which Hawes recognized would jeopardize his investment and his employment with the company.

{¶ 19} Within a "couple of days" of beginning his job at Downing Health, Hawes discovered that Downing Health was "fundamentally different than what had been represented" and was in fact a "sham." Hawes's first four paychecks were late, with some being as late as five months. There were several other gaps in pay during 2015, and Hawes's last paycheck covered the period of July 1 through July 15, 2015,

although Hawes was employed at the company until August 2015. Hawes was never provided with a W-2 tax form for his 2014 compensation.

{¶ 20} Hawes later learned that Lawrence and other employees were owed back pay from 2014 and 2015. An email was sent to all employees regarding a payroll recovery plan and explained when employees would receive the back pay for 2014 and 2015. This plan was never implemented.

{¶ 21} There were also problems with the medical insurance and premiums not being paid by the company. Hawes and his family lost their health benefits multiple times. Hawes paid his own January 2015 deductible and requested reimbursement but received none. Hawes additionally paid $8,008 in COBRA benefits for August and September 2015.

{¶ 22} In April 2015, Hawes told Lawrence that he would not recommend investors for Downing Health because it was not a valid company. Hawes thought he might be terminated, but instead, Lawrence demoted him.

{¶ 23} At the same time that Hawes's position was demoted, Downing Digital Healthcare Group, LLC underwent a name change to Downing Health Technologies, LLC. Hawes entered into a new employment agreement in May 2015 reflecting the company name change and his "title change with a little bit of a territory change," with "everything [else]" staying "the same." Hawes dealt exclusively with Lawrence in negotiating the contract, and Shaut was not involved. At the time he signed the second employment agreement, Hawes was interviewing with other employers

trying to find a new job. Hawes signed the agreement to stay with the company because he could still get paid when the company brought on new investors.

{¶ 24} On August 25, 2015, Hawes sent an email to various employees of the corporate defendants, including Shaut, memorializing the issues that had been occurring since November 2014 regarding employees being paid incorrectly. Downing employees generally only got paid when a new employee was hired, and the new employee made a $250,000 investment in the company.

{¶ 25} At the end of the email, Hawes asked for his $250,000 investment back and to be paid in full for the work he had performed up until that point; he further asked for his W-2 tax form for tax year 2014, which he had never received. He set a deadline for payment and receipt of the W-2 tax form of August 28, 2015.

{¶ 26} Hawes did not receive his requested money and tax form and instead received an email the following day advising him that the decision had been made on August 21, 2015 to terminate his employment. Hawes began a new job thereafter that paid an annual salary of $175,000.

{¶ 27} Hawes filed a complaint against Shaut, Lawrence, Wagner, and the corporate defendants. The amended complaint alleged claims for breach of employment contract, violation of the Prompt Pay Act, fraudulent inducement (employment contract), breach of investment contract, fraudulent inducement (investment contract), conspiracy, violation of Blue Sky laws, conversion, and breach of fiduciary duty.

{¶ 28} During the pendency of the litigation, all of the corporate defendants went out of business. In addition, Wagner and Lawrence filed for personal bankruptcy and the claims against them were stayed. Shaut was the only defendant that remained at the time of trial.

{¶ 29} Shaut moved for summary judgment on the claims against him. Hawes opposed the motion and cross-moved for summary judgment on all of his claims. The trial court granted Hawes summary judgment against the corporate defendants, who had not responded to his motion. The court further granted summary judgment to Shaut on Hawes's claims for breach of employment contract, breach of investment contract, and conversion.

{¶ 30} The matter proceeded to a bench trial on the remaining claims where both Hawes and Shaut testified. No other witnesses were offered for either side. In lieu of closing arguments, the trial court ordered the parties to submit proposed findings of fact and conclusions of law. The trial court then held a virtual hearing to allow the parties to further argue their proposed findings of fact and conclusions of law.

{¶ 31} The trial court subsequently issued its own findings of fact and conclusions of law. The trial court found in favor of Hawes on each of his claims against Shaut and awarded damages as follows:

> Plaintiff submitted compelling proof that he had sustained significant economic damages. The following enumerates the different categories of damages: loss of the initial $250,000 investment; back salary not paid in the amount of $45,362; back COBRA payments while an employee in the amount of $8,008; personal payment of healthcare

premiums for three months in the amount of $12,012; unpaid personal time off never reimbursed in the amount of $5,114; federal taxes paid by Hawes (but owed by the corporation) in the amount of $4,656; and the remainder of the 2-year contract for salary from September 2015 through October 31, 2016, in the amount of $262,500. (Tr. 181-183). Thus, Hawes' total compensatory damages as enumerated above total $587,652.00. (Tr. 183). This amount does not include any interest, costs, exemplary damages or attorneys' fees.

* * *

In accordance with the damage calculations discussed in paragraph 49 of the Findings of Fact above, the Court awards damages in the amount of $587,652.00 to Hawes against Shaut, jointly and severally with all the Downing Corporate Defendants. The Court further adopts Hawes' calculation of past pre-judgment interest at the current statutory rate of 4% on $587,652.00, which is $23,506.08 per year and $64.40 per day. From October 31, 2016, through April 30, 2020, the past-due interest amount is $82,271.28, for a total amount of $669,923.28. The Court further awards punitive damages in the amount of $1,000,000.00 on the fraud and breach of fiduciary duty claims, which provide for exemplary damages. The Court hereby enters judgment accordingly against Shaut and all the Downing Corporate Defendants, jointly and severally, in the total amount of $1,669,923.28, plus future postjudgment interest on that amounts [sic] at the statutory rate of 4% or $73.42 per diem until paid in full.

{¶ 32} The trial court further found that Hawes was entitled to reasonable attorney fees. The parties filed briefs and the court held a hearing on the attorney fees issue. Following the hearing, the court awarded attorney fees as follows:

The court found, after having reviewed the affidavit of plaintiff's trial counsel Christopher Devito, the affidavit of the expert attorney Paul Grieco, the relevant case law, and the factors spelled out in Prof.Cond.R. 1.5(a), that based upon the considerations of a customary hourly rate in the local legal community for comparable legal services, the experience and ability of plaintiff[']s counsel Christopher Devito, the time expended (i.e, over 270 hours of itemized attorney time) and results obtained, the complexity of the case, and the contingent fee agreement, an upwards adjustment of the lodestar on attorney Christopher Devito's hourly rate of $750.00 per hour is reasonable and

necessary. Accordingly, the court grants Hawes' application for attorneys' fees in the contingency fee amount of 45% of the $1,699,923.28 damages determined by the court, for a total of $764,965.44 in attorneys' fees, plus litigation expenses of $2,700.36.

{¶ 33} Shaut then filed the instant appeal,[2] raising nine assignments of error for our review:

1. The trial court abused its discretion in awarding $764,965.44 in attorney's fees to the Appellee.

2. The trial court abused its discretion in awarding $1,000,000 in punitive damages to the Appellee.

3. The trial court erred in holding that the Appellant breached a de facto fiduciary duty allegedly owed to the Appellee.

4. The trial court erred in failing to hold that the Appellee waived his claim against the Appellant for fraudulently inducing his consent to the contested employment agreement.

5. The trial court erred by failing to offset the Appellee's recovery under his employment agreement by the amount he earned from other employers during the unfulfilled term of the contract.

6. The trial court erred in permitting the Appellee to recover on unilateral claims based on an investment that he and his wife owned jointly.

7. The trial court erred in failing to hold that the intra-corporate conspiracy doctrine barred the Appellee's claim against the Appellant for conspiracy.

8. The trial court erred by failing to make any finding on the disputed issue of fraudulent intent.

9. The trial court erred in simultaneously awarding the Appellee recovery under both R.C. 1707.41 and R.C. 1707.43.

---

[2] Shaut's appeal challenges the trial court's decision on all of Hawes's claims except for violation of the Prompt Pay Act, R.C. 4113.15.

## II. Law and Analysis

## A. Irregularities in the Court's Findings of Fact

{¶ 34} Preliminarily, Shaut argues that there were certain irregularities in the trial court's treatment of the evidence that worked to his detriment. Specifically, Shaut cites incorrect references to page numbers in the trial transcript and exhibits from trial. Shaut further asserts that the trial court relied upon the deposition testimony of Wagner and Lawrence, which were not offered at trial.

{¶ 35} App.R. 12 outlines the parameters of the appellate court's exercise of its reviewing powers and provides that a court of appeals is not required to consider errors that were not separately assigned and argued, as required by App.R. 16(A). *Hungler v. Cincinnati*, 25 Ohio St.3d 338, 341, 496 N.E.2d 912 (1986). "'[E]rrors not specifically pointed out in the record and separately argued by brief may be disregarded.'" *State v. Mock*, 8th Dist. Cuyahoga No. 108837, 2020-Ohio-3667, ¶ 33, quoting *State v. Hill*, 8th Dist. Cuyahoga No. 70930, 1997 Ohio App. LEXIS 3006, 12 (July 10, 1997), citing *C. Miller Chevrolet v. Willoughby Hills*, 38 Ohio St.2d 298, 313 N.E.2d 400 (1974).

{¶ 36} Shaut did not separately assign his argument regarding the court's findings as error. It is evident from the court's journal entry that the trial court did rely on the depositions of Wagner and Lawrence, which were not offered as exhibits during the trial. In stating that it was appropriate to consider such items, the trial court appeared to conflate the concepts of "evidence in the record" and "evidence at trial." "In rendering judgment after a bench trial, a trial court considers the evidence

adduced from the witness stand, the exhibits admitted during trial, and stipulations." *Kidane v. Gezahegn*, 10th Dist. Franklin No. 14AP-892, 2015-Ohio-2662, ¶ 20, citing *Midstate Educators Credit Union, Inc. v. Werner*, 175 Ohio App.3d 288, 2008-Ohio-641, 886 N.E.2d 893, ¶ 35 (10th Dist.). Other evidence that is in the record but not admitted at trial may not be considered. *Hoaglin Holdings v. Goliath Mtge., Inc.*, 8th Dist. Cuyahoga No. 83657, 2004-Ohio-3473, ¶ 15.

{¶ 37} Hawes takes the same position as the trial court, erroneously asserting that the court could consider all of the evidence *in the record*. While Shaut now argues that the trial court was not permitted to rely upon depositions that had not been admitted as evidence, during the trial, his counsel (who is also his counsel of record in this appeal) posited that the depositions were part of the record and erroneously agreed that they could be considered as part of the evidence in the trial:

> [Hawes's Counsel]: Objection.
>
> [Hawes]: I'm sorry?
>
> [Hawes's Counsel]: For the record, we've submitted the depositions and gave notice of them. So they're in the record. Mr. Wagner, Mr. Lawrence. So they're in the record.
>
> The Court: Right.
>
> [Shaut's Counsel]: Yeah. But they don't testify about this.
>
> The Court: But their depositions are part of the record, so they are actually evidence to be considered.
>
> [Shaut's Counsel]: *I agree, your Honor*, but they don't address this subject.

(Emphasis added.)

{¶ 38} The depositions of Wagner and Lawrence were not admitted, or even offered, at trial and should not have been considered by the trial court in rendering its decision. Consequently, in evaluating any of Shaut's assignments of error that ask us to examine the evidence presented with regard to a claim, we must consider only whether the actual admitted evidence was sufficient to meet Hawes's burden of proof without relying upon the depositions cited by the trial court. If the trial court considered evidence not admitted at trial, we must determine whether the trial court could have made the same decision without the evidence not admitted at trial. *See Secy. of Veterans Affairs v. Leonhardt*, 2015-Ohio-931, 29 N.E.3d 1, ¶ 33 (3d Dist.); *Maldonado v. Maldonado*, 5th Dist. Stark No. 2003CA00329, 2004-Ohio-3648, ¶ 30.

{¶ 39} With the above in mind, we now turn to Shaut's assignments of error. For ease of discussion, we will address some of the assignments of error out of order.

### B. Fiduciary Duty owed to Hawes

{¶ 40} In his third assignment of error, Shaut argues that the trial court erred in holding that he breached a de facto fiduciary duty allegedly owed to Hawes. Specifically, Shaut contends that the trial court erroneously determined that Shaut owed Hawes a de facto fiduciary duty, requiring him to make specified disclosures about Downing Health when the two met prior to Hawes joining the company.

{¶ 41} While not specifically stated by Shaut, he is essentially arguing that the trial court's determination that he breached his fiduciary duty to Hawes was against the manifest weight of the evidence. When reviewing the manifest weight of the

evidence, the reviewing court "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, [the trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.'" *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). The standard set forth in *Thompkins* has been held to apply in civil cases. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 17.

{¶ 42} With regard to its finding that a de facto fiduciary duty existed, the trial court stated as follows:

> In this case, the prospective employer and the prospective investment into Downing Health created a de facto fiduciary relationship with Hawes because both parties understood that a special trust or confidence has been reposed in the other. Specifically, Hawes was solicited by Shaut, a Board Member and Senior Management Director for fundraising, to become an employee and invest $250,000 into Downing Health because of its policy for senior level management to have "skin in the game." Hawes was meeting with Shaut because he was represented as the individual at Downing Health (above its president Lawrence) that knew the most about the company and could explain the investment and viability of employment and $250,000 investment (P. Ex. 8). Based upon this mutual understanding, a fiduciary relationship was created and Shaut was obligated to be truthful.

{¶ 43} A fiduciary relationship is one in which "special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtue of this special trust." *Stone v. Davis*, 66 Ohio St.2d 74, 419 N.E.2d 1094 (1981); *Haluka v. Baker*, 66 Ohio App. 308, 34 N.E.2d 68 (9th Dist.1941); *Tool Steel Prods. Sales Corp. v. XTEK, Inc.*, 2d Dist.

Hamilton No. C-910533, 1993 Ohio App. LEXIS 333 (Jan. 29, 1993). A de facto fiduciary relationship may arise from an informal confidential relationship. *Prudential Ins. Co. v. Eslick*, 586 F.Supp. 763 (S.D.Ohio 1984); *Walters v. First Natl. Bank of Newark*, 69 Ohio St.2d 677, 433 N.E.2d 608 (1982).

{¶ 44} "'A confidential relationship exists whenever trust and confidence is placed in the integrity and fidelity of another.'" *Golub v. Golub*, 8th Dist. Cuyahoga No. 97603, 2012-Ohio-2509, ¶ 33, quoting *Ament v. Reassure Am. Life Ins. Co.*, 180 Ohio App.3d 440, 2009-Ohio-36, 905 N.E.2d 1246, ¶ 39 (8th Dist.). "''The determination concerning what constitutes a confidential (fiduciary) relationship is a question of fact dependent upon the circumstances in each case * * *.'''" *Ryerson v. White*, 8th Dist. Cuyahoga No. 100547, 2014-Ohio-3233, ¶ 19, quoting *Ciszewski v. Kolaczewski*, 9th Dist. Summit No. 26508, 2013-Ohio-1765, ¶ 10, quoting *Indermill v. United Sav.*, 5 Ohio App.3d 243, 245, 451 N.E.2d 538 (9th Dist.1982).

{¶ 45} The Supreme Court of Ohio has explained that a fiduciary duty may arise from an informal relationship only if both parties understand that a special trust or confidence has been reposed. *Stancik v. Deutsche Natl. Bank*, 8th Dist. Cuyahoga No. 102019, 2015-Ohio-2517, ¶ 49-50, citing *Stone* at 78.

{¶ 46} In the instant matter, Shaut and Hawes were negotiating an arms-length commercial transaction. There was no evidence presented to indicate that the parties stood in a position of special confidence to each other or that Shaut exerted a position of superiority of influence over Hawes. *See Landskroner v. Landskroner*, 154 Ohio App.3d 471, 2003-Ohio-5077, 797 N.E.2d 1002, ¶ 32 (8th

Dist.); *Blon v. Bank One*, 35 Ohio St.3d 98, 519 N.E.2d 363 (1988); *Warren v. Percy Wilson Mtge. & Fin. Corp.*, 15 Ohio App.3d 48, 472 N.E.2d 364 (1st Dist.1984) (no fiduciary status arising from advice given in routine business relationship between debtor and creditor).

{¶ 47} Moreover, courts have required complete dependence by the inferior party in order to recognize the de facto status. *Cook v. Kudlacz*, 2012-Ohio-2999, 974 N.E.2d 706, ¶ 79 (7th Dist.), citing *Casey v. Reidy,* 180 Ohio App.3d 615, 2009-Ohio-415, 906 N.E.2d 1139, ¶ 33-36 (7th Dist.). There was no evidence presented that Shaut had any knowledge that Hawes was relying upon him as a fiduciary in deciding to invest in the company. More importantly, Hawes did not present evidence demonstrating that he depended completely on Shaut. Hawes testified that he was uncertain about the investment and joining the company, and Boyle suggested that he speak with Shaut.

{¶ 48} At the time of Hawes and Shaut's conversation, Hawes had worked in the healthcare industry for a number of years and had held executive positions within the industry. He testified that he had had meaningful business experience, knew how to read financial documents, and knew what questions to ask about prospective investments. While Shaut was at the meeting to answer Hawes's questions, his ultimate purpose was to sell Hawes on the company. Finally, Hawes testified that he also consulted his wife and some venture capital friends, including Renson, who advised him *not* to invest in the company.

**{¶ 49}** Upon weighing the evidence and making all reasonable inferences, we find that the trial court's determination that Shaut owed a fiduciary duty to Hawes was against the manifest weight of the evidence. Accordingly, Hawes's breach-of-fiduciary-duty claim must fail, and the judgment of the trial court on this claim is reversed. Shaut's third assignment of error is sustained.

## C. Waiver-of-Fraudulent-Inducement (Employment-Contract) Claim

**{¶ 50}** In his fourth assignment of error, Shaut argues that the trial court erred in failing to hold that Hawes waived his claim against Shaut for fraudulently inducing his consent to the contested employment agreement. Shaut contends that Hawes waived his right to recover on his claim for fraudulent inducement with regard to the employment contract because Hawes remained employed after learning of the fraud.

**{¶ 51}** In its analysis of Shaut's argument that Hawes waived his claim regarding fraudulent inducement of the employment contract, the court held:

> The Court finds and concludes to the contrary. In one of the cases cited by Shaut, *Ziegler v. Findlay Industries*, 380 F.Supp.2d 909 (N.D.Ohio 2005), the court indeed explained the Ohio rule that "the performance of an executory contract after knowledge of facts making it voidable on the ground of fraud in its procurement, is a waiver of any right of action for damages for the fraud." *Id.* at 911 (internal citations omitted). But the court quickly added: "*unless to stop performance would be impracticable.*" *Id.* (emphasis added).
>
> Hawes' testimony, including his demeanor on the witness stand, painted a scenario of what can fairly be described as desperation, in which Hawes, having already shelled out a quarter of a million dollars for the privilege of securing a job, continued to work with the hope of having at least some income and continued health insurance benefits to support and care for his family. In this context, the trial testimony leads this Court to conclude that the "continued performance result[ed]

from the parties' [or at the very least Hawes's] efforts to remedy the alleged fraud." *Globe Metallurgical v. Hewlett-Packard Co.*, 953 F.Supp. 876, 882-883 (S.D.Ohio 1994). In light of this, the Court, like the Southern District of Ohio in *Globe Metallurgical*, finds that there are "valid policy reasons" for not applying the general rule to the facts of this case. *Id.* at 883.

{¶ 52} Shaut argues that the impracticability found by the trial court does not rise to the same level of impracticability found by other courts, which often was the result of danger or impossibility of performance. He contends that impracticability is based upon an objective standard and does not turn on the particular person's capacity to act. Shaut notes that Hawes learned of the fraud within several days of starting at the company yet continued to work there for ten months. Shaut maintains that Hawes's personal feelings of desperation did not constitute impracticability.

{¶ 53} Shaut additionally argues that Hawes waived his fraudulent-inducement claim by knowingly entering into the second employment contract. The trial court disregarded this argument because Shaut did not provide any Ohio authority in support.

{¶ 54} In Ohio, one who performs a contract after learning of fraud in its inducement ratifies the contract and may not subsequently disaffirm it. *Baltimore & Ohio R.R. Co. v. Jolly Bros. & Co.*, 71 Ohio St. 92, 128, 72 N.E. 888 (1904). Moreover, "the performance of an executory contract after knowledge of facts making it voidable on the ground of fraud in its procurement, is a waiver of any right

of action for damages for the fraud," unless to stop performance would be impracticable. *Id.*

{¶ 55} In *Jolly Bros.*, the Baltimore & Ohio Railroad hired Jolly Brothers as excavators to remove a large amount of earth. Jolly Brothers claimed Baltimore & Ohio fraudulently described the material to be removed as easily excavated, dry sand. A few weeks after transporting its workers and equipment to the site and commencing work, Jolly Brothers learned the majority of the material to be removed was mud and quicksand, which were much costlier to excavate. Jolly Brothers threatened to quit, but after a Baltimore & Ohio Railroad employee promised to increase their compensation, they continued to work. The railroad subsequently failed to honor that promise, and the excavators sued for fraudulent inducement. The Supreme Court of Ohio explained:

> Here the facts were known within a week or two after the commencement of the work, and the plaintiffs could not go on with the work, accept payment at the prices stipulated in the contract, and then, when it proved a losing venture, quit and sue for damages on the ground that their loss was caused not by themselves in electing to go on with the work but by the false representations of the defendant.

*Id.*

{¶ 56} Like the workers in *Jolly Brothers*, Hawes testified that he learned of the fraud soon after beginning to work for Downing Health — in fact, within merely "a couple of days." Yet he continued to work and even signed a second employment agreement containing the same terms when he was demoted to a different position. Hawes argues, and the trial court agreed, that it was "impracticable" for him to quit

working there because he was trying to remedy the claimed fraud. The trial court determined that he continued working out of "desperation."

{¶ 57} We cannot find that Hawes's "desperation" and desire to remedy the fraud constituted impracticability as that term has been used in this context. Like the workers in *Jolly Brothers*, Hawes could not accept the financial conditions under which he was working, even signing a subsequent employment agreement, and when it proved to be a losing venture, quit and sue for damages on the ground that his loss was caused by the fraud on the part of Shaut and the corporate defendants and not by Hawes's continued employment at Downing Health.

{¶ 58} We therefore find that Hawes waived his claim for fraudulent inducement with regard to the employment contract by continuing to perform the contract and even signing a subsequent contract with the same terms all the while being fully aware of the claimed fraud by Shaut and the company. Shaut's fourth assignment of error is sustained, and the judgment of the trial court finding in favor of Hawes on his fraudulent inducement of the employment-contract claim is reversed. Hawes is not entitled to damages related to his claim for fraudulent inducement of the employment contract.

## D. Failure to Offset Other Income

{¶ 59} Shaut's fifth assignment of error argues that the trial court erred by failing to offset Hawes's recovery under his employment agreement by the amount he earned from other employers during the unfulfilled term of the contract.

{¶ 60} The trial court awarded Hawes $262,500 for the unexpired term of the contract at the time he left Downing Health. During this time, Hawes testified that he had worked for other companies, earning an annual salary of $175,000. Shaut argues that the court erred in failing to reduce the damages awarded on the unexpired contract by the other amounts earned from subsequent employers during the same time period and allowed Hawes to obtain double recovery.

{¶ 61} Because we determined that Hawes waived his fraudulent inducement of the employment-agreement claim, Hawes cannot recover for this claim, and we need not address whether the trial court was required to offset his damages by the amount of compensation Hawes earned from other employment during the unexpired term of the employment agreement. Shaut's fifth assignment of error is overruled.

### E. Intracorporate-Conspiracy Doctrine

{¶ 62} Shaut's seventh assignment of error argues that the trial court erred in failing to hold that the intracorporate-conspiracy doctrine barred Hawes's claim against Shaut for conspiracy. Shaut asserts this doctrine holds that a corporation cannot conspire with its own agents or employees.

{¶ 63} Civil conspiracy is a tort where "'a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages.'" *Williams v. Aetna Fin. Co.*, 83 Ohio St.3d 464, 475, 700 N.E.2d 859 (1998), quoting *Kenty v. Transamerica Premium Ins. Co.*, 72 Ohio St.3d 415, 419, 650 N.E.2d 863 (1995). However, when all the alleged

coconspirators are members of the same corporate entity, there are not two separate "people" to form a conspiracy. *See Bays v. Canty*, 330 Fed.Appx. 594 (6th Cir.2009); *Ohio Vestibular & Balance Ctrs., Inc. v. Wheeler*, 2013-Ohio-4417, 999 N.E.2d 241, ¶ 28-30 (6th Dist.), citing *Kerr v. Hurd*, 694 F.Supp.2d 817, 834 (S.D.Ohio 2010), explaining that a corporation cannot conspire with its own agents or employees; *see also Hometown Health Plan v. Aultman Health Found.*, Tuscarawas C.P. No. 2006 CV 06 0350, 2009 Ohio Misc. LEXIS 550, 36 (Apr. 15, 2009) (Because a corporation and its wholly owned subsidiary have a unity of purpose or a common design, a corporation cannot generally be deemed to have conspired with its wholly owned subsidiary, or its officers and agents.).

{¶ 64} The trial court determined that Shaut was part of a malicious combination with two other individuals and the corporate defendants but did not address the applicability of the intracorporate-conspiracy doctrine. Shaut contends that the corporate defendants were interrelated companies, and that he, Lawrence, and Wagner each worked under the Downing name and therefore belonged to the same corporate family.

{¶ 65} Hawes asserts that there was no testimony or evidence that all of the corporate defendants were interrelated businesses or in the same corporate family of companies. He contends that simply because some of the entities have "Downing" in their name does not mean that they are the same legal entity.

{¶ 66} We agree that there was insufficient evidence presented at trial outlining the relationships between the corporate defendants. Consequently, we

find that Shaut failed to demonstrate that all of the corporate defendants, Wagner, Lawrence, and Shaut were part of the same corporate family. Thus, the trial court did not err in declining to find that the intracorporate-conspiracy doctrine barred Hawes's claim for civil conspiracy. Shaut's seventh assignment of error is overruled.

### F. Failure to Make Findings Regarding Fraudulent Intent

{¶ 67} In his eighth assignment of error, Shaut argues that the trial court erred by failing to make any findings on the disputed issue of fraudulent intent. We note that Shaut is not arguing that the decision finding in favor of Hawes on the fraudulent-inducement claims was against the manifest weight of the evidence, but simply asserts that the court failed to make a finding regarding the same.

{¶ 68} Paragraph 8 of the "Conclusions of Law" section of the trial court's journal entry states as follows: "These material representations were made by Shaut with his knowledge of their falsity and intent to mislead Hawes into becoming an employee and investing $250,000 into Downing Health." While this statement is under the "Conclusions of Law" section, it is very clearly a finding of fact that the statements were made by Shaut with the intent to mislead Hawes. Thus, the court did make a finding relating to Shaut's fraudulent intent, and Shaut's eighth assignment of error is overruled.

### G. Recovery Under Both R.C. 1707.41 and 1707.43

{¶ 69} Shaut's ninth assignment of error argues that the trial court erred in simultaneously awarding Hawes recovery under both R.C. 1707.41 and 1707.43.

Shaut contends that Hawes was required to elect under which statute he would pursue his claims.

{¶ 70} Shaut is correct that a plaintiff must make an election with regard to claims brought under R.C. 1707.41 and 1707.43. However, the election pertains solely to the remedy sought — damages under R.C. 1707.41 or recission under R.C. 1707.43. *See, e.g., Federated Mgt. Co. v. Coopers & Lybrand*, 10th Dist. Franklin No. 03AP-204, 2004-Ohio-4785, ¶ 11. As noted by Hawes, he abandoned any action for recission and elected to solely pursue damages. The trial court, however, analyzed Hawes's claims under both statutory sections and determined that Hawes was entitled to judgment on both. This was not correct because a plaintiff is required to elect which remedy he or she is pursuing and may only recover under one section. Here, Hawes elected to pursue damages and waived any remedy of recission and consequently could not recover under R.C. 1707.43. *See Ohio Bur. of Workers' Comp. v. MDL Active Duration Fund, LTD.*, 476 F.Supp.2d 809, 820 (S.D.Ohio 2007), citing *Byrley v. Nationwide Life Ins. Co.*, 94 Ohio App.3d 1, 20, 640 N.E.2d 187 (6th Dist.1994).

{¶ 71} Accordingly, the trial court erred by granting judgment and awarding damages under both statutory sections. By seeking damages rather than recission, Hawes elected to proceed under R.C. 1707.41 and abandoned his claim under R.C. 1707.43. Shaut's ninth assignment of error is sustained, and the court's judgment in favor of Hawes on his claim under R.C. 1707.43 is vacated. The court's judgment in favor of Hawes on his claim under R.C. 1707.41 remains.

## H. Allowing Hawes to Recover on Unilateral Claims Jointly Owned by Hawes and His Wife

{¶ 72} In his sixth assignment of error, Shaut argues that the trial court erred in permitting Hawes to recover on unilateral claims based on an investment that he and his wife owned jointly. Shaut asserts that Hawes should not have been permitted to sue and recover individually when Hawes and his wife owned the investment jointly.

{¶ 73} In its journal entry, the trial court determined that Shaut had waived this argument and specifically had waived the defense of failure to join a party under Civ.R. 19 or 19.1. While the court stated that Shaut did raise the affirmative defense of failure to name all necessary parties, the defense was simply a cursory statement and did not identify the specific parties that needed to be joined. The court further noted that Shaut did not argue the defense in his motion for summary judgment and held that its assertion in his trial brief was untimely.

{¶ 74} The court further noted that Civ.R. 12(H) permits a party to raise the defense of failure to join an "indispensable" party even at the trial on the merits. The court held, however, that Shaut only raised the "necessary" party defense at trial but never argued that Hawes's wife was "indispensable."

> "A court may determine that a party is necessary for the just and complete adjudication of an action and a necessary party may be forced to join the action as an indispensable party under Civ.R. 19(B). If a trial court determines that a party is indispensable to the action, that the party is subject to service of process, and that the nonjoinder issue has not been waived, then the court has no discretion under Civ.R. 19(A) and (B) and the party must be joined or the case dismissed." *State, ex rel. Gill v. Winters* (1990), 68 Ohio App.3d 497, 589 N.E.2d 68.

*Ownbey v. Professional Realty Inc.*, 8th Dist. Cuyahoga No. 82468, 2003-Ohio-4949, ¶ 12.

{¶ 75} Shaut did not move to add Hawes's wife as a party, nor did he move to dismiss the claims to which he asserts she should have been a party. At trial, Hawes was questioned as to whether his wife had signed the security, but no further argument was made to the court regarding this issue.

{¶ 76} We therefore find that the trial court properly determined that Shaut waived the issue of joinder. Shaut's sixth assignment of error is overruled.

## I. Award of Punitive Damages

{¶ 77} In his second assignment of error, Shaut argues that the trial court abused its discretion in awarding $1,000,000 in punitive damages to Hawes.

{¶ 78} Under Ohio law, an award of punitive damages is available only upon a finding of actual malice. *Wills v. Kolis*, 8th Dist. Cuyahoga No. 93900, 2010-Ohio-4351, ¶ 47-48, citing *Berge v. Columbus Community Cable Access*, 136 Ohio App.3d 281, 316, 736 N.E.2d 517 (10th Dist.1999). The "actual malice" necessary for purposes of an award of punitive damages has been defined as "'(1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm.'" *Berge*, quoting *Preston v. Murty*, 32 Ohio St.3d 334, 512 N.E.2d 1174 (1987), syllabus.

{¶ 79} A plaintiff bears the burden of establishing entitlement to punitive damages by clear and convincing evidence. *Kelley v. Sullivan*, 8th Dist. Cuyahoga

No. 106189, 2018-Ohio-1410, ¶ 13, citing *Whetstone v. Binner*, 146 Ohio St.3d 395, 2016-Ohio-1006, 57 N.E.3d 1111, ¶ 20. The decision whether to award punitive damages is within the trial court's discretion and, absent an abuse of discretion, the court's ruling will be upheld. *Kemp v. Kemp*, 161 Ohio App.3d 671, 2005-Ohio-3120, 831 N.E.2d 1038, ¶ 73 (5th Dist.).

{¶ 80} In its journal entry, the court stated that it further "award[ed] punitive damages in the amount of $1,000,000.00 on the fraud and breach of fiduciary duty claims, which provide for exemplary damages." However, the court made no finding of actual malice or whether Hawes had presented clear and convincing evidence to support a punitive damage award.

{¶ 81} Hawes contends that the following factual finding by the court supports the award of punitive damages:

> Shaut admitted during cross-examination that a fair characterization of Downing is that it was a Ponzi scheme. (Tr. 339). However, he claimed he did not become aware of that until his deposition in this matter on July 26, 2016. (Tr. 340). Further, Shaut admitted that by the second day of trial, January 14, 2020, he "was in agreement" with Hawes' attorney that "Wagner is a fraud" and personally lied to Shaut regarding Downing. (Tr. 368).

{¶ 82} Hawes further points to instances where the trial court stated that Shaut was not credible. Finally, Hawes argues that the trial court properly found that Hawes had established all of the required elements for his breach-of-fiduciary-duty claims and civil-conspiracy claims, which included a finding of malice by Shaut.

{¶ 83} We do not believe the above findings cited by Hawes are sufficient to support an award of punitive damages. First, we have already reversed the court's

judgment on Hawes's breach-of-fiduciary-duty claim. Nevertheless, actual malice is not an element of either a breach-of-fiduciary-duty claim or a civil-conspiracy claim. While an element of civil conspiracy is "a malicious combination," the malice referenced is not *actual* malice. Rather,

> "[t]he 'malice' in 'malicious combination' is legal or implied malice, 'which the law infers from or imputes to certain acts,' and is defined as 'that state of mind under which a person does a wrongful act purposely, without a reasonable or lawful excuse, to the injury of another.' *See Pickle v. Swinehart* (1960), 170 Ohio St. 441, 443, 166 N.E.2d 22 (defining 'malice' for purposes of 'malicious prosecution'). This 'malice,' then, would be inferred from or imputed to a common design by two or more persons to cause harm to another by means of an underlying tort, and need not be proven separately or expressly."

*Click v. Unknown Exr. or Admr. (Estate of Click)*, 4th Dist. Lawrence No. 05CA38, 2007-Ohio-3029, ¶ 21, quoting *Gosden v. Louis*, 116 Ohio App.3d 195, 219-220, 687 N.E.2d 481 (9th Dist.1996); *see also Youngstown Osteopathic Hosp. Assn. v. Pathways Ctr. For Geriatric Psychiatry, Inc.*, 280 B.R. 400, 416 (Bankr.N.D.Ohio 2002) (noting that implied malice in the context of civil conspiracy does not rise to the level of actual malice).

{¶ 84} Accordingly, we find that Hawes did not present clear and convincing evidence that Shaut acted with actual malice, and the trial court abused its discretion in awarding punitive damages in this matter. Shaut's second assignment of error is sustained, and the award of punitive damages of $1,000,000 is vacated.

### J. Award of Attorney Fees

{¶ 85} In his first assignment of error, Shaut argues that the trial court abused its discretion in awarding $764,965.44 in attorney fees to Hawes. Shaut

argues that the amount of attorney fees was not reasonable and that Hawes did not sufficiently prove the lodestar used by the court.

{¶ 86} "The Supreme Court of Ohio, as well as this court, has held that attorney fees are recoverable as part of compensatory damages only when punitive damages have been awarded." *Danial v. Lancaster*, 8th Dist. Cuyahoga No. 92462, 2009-Ohio-3599, ¶ 18, citing *Davis v. Tunison*, 168 Ohio St. 471, 477, 155 N.E.2d 904 (1959); *Wilson v. Harvey*, 164 Ohio App.3d 278, 290, 2005-Ohio-5722, 842 N.E.2d 83 (8th Dist.).

{¶ 87} In *Digital & Analog Design Corp. v. N. Supply Co.*, 63 Ohio St.3d 657, 590 N.E.2d 737 (1992), the court further provided that "the requirement that a party pay attorney fees * * * is a punitive (and thus equitable) remedy that flows from a jury finding of [actual] malice and the award of punitive damages. * * * Without a finding of [actual] malice and the award of punitive damages, plaintiff cannot justify the award of attorney fees, unless there is a basis for sanctions under Civ.R. 11." *Id.* at 662.

{¶ 88} Because we determined that the award of punitive damages was improper, there can be no award of attorney fees. We need not address Shaut's arguments regarding the reasonableness of fees or the method of computation. Shaut's first assignment of error is sustained, and the award of attorney fees is vacated.

## III. Conclusion

{¶ 89} The trial court did not err in (1) declining to offset Hawes's recovery by the amount he earned from other employers; (2) allowing Hawes to recover on the investment that was jointly owned by himself and his wife; and (3) declining to apply the intracorporate-conspiracy doctrine. In addition, the trial court did make a finding on the issue of fraudulent intent and thus did not err on this issue. Shaut's fifth, sixth, seventh, and eighth assignments of error are overruled.

{¶ 90} The trial court did err in finding that Shaut owed a de facto fiduciary duty to Hawes, and the court's judgment in favor of Hawes on the breach-of-fiduciary-duty claim was against the manifest weight of the evidence. The court further erred in (1) finding that Hawes had not waived his claim for fraudulent inducement with regard to the employment contract by continuing to work for Downing Health and signing a subsequent agreement under the same terms; (2) awarding Hawes relief under R.C. 1707.43 when he elected to proceed under R.C. 1707.41; and (3) awarding punitive damages and attorney fees.

{¶ 91} Shaut's first, second, third, fourth, and ninth assignments of error are sustained, and the damages awarded to Hawes for his claims for breach of fiduciary duty, fraudulent inducement of the employment agreement, and his claim under R.C. 1707.43, plus the punitive damages, and the award of attorney fees are hereby vacated.

{¶ 92} It is not clear from the trial court's journal entry what damages were awarded for each claim. Accordingly, this matter is remanded to the trial court to

clarify the proper damages for the judgments that remain in favor of Hawes in accordance with this decision, to wit: his claim under the Prompt Pay Act, his claim under R.C. 1707.41, his claim for fraudulent inducement of the investment contract, and his claim for civil conspiracy.

{¶ 93} We emphasize that this matter is not being remanded for a new trial on any of the claims or further findings by the trial court. The remand is solely for a new ruling clarifying the damages awarded on the remaining four claims, as set forth above.

{¶ 94} Judgment affirmed in part, reversed in part, vacated in part, and remanded.

Costs of the appeal are to be shared evenly between the parties pursuant to App.R. 24.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
FRANK DANIEL CELEBREZZE, III, JUDGE

SEAN C. GALLAGHER, A.J., and
MICHELLE J. SHEEHAN, J., CONCUR